UNITED STATES OF AMERICA
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                Case No. 19-cr-20478
                                        Honorable Denise Page Hood

PAVEL STASSI,

        Defendant.
_____/

**DEFENDANT STASSI'S REPLY TO
GOVERNMENT'S SENTENCING MEMORANDUM**

In its sentencing memorandum, the government writes that "Defendants Aleksandr Grichishkin, Andrei Skvortsov, Aleksandr Skorodumov, and Pavel Stassi were founders and/or members of a so called "bulletproof" hosting organization (the "Organization"). ECF No. 77, Page ID.545. While the statement is literally true, it should be noted that Mr. Stassi was not a "founder" of the "organization." Rather, he was an employee who was hired well after the organization was involved in "bulletproof" hosting, making $7,200 per year when he was first hired and $11,400 per year when he left the company. Moreover, when Mr. Stassi was first hired he had no idea that the "organization" was involved in any criminal activity. Although, he became aware of that fact after working at the "organization" for several months.

Yes, Mr. Stassi "undertook various administrative tasks, including conducting and tracking online marketing to the organization's criminal clientele and using stolen and/or false personal information to register web hosting and financial accounts used by the organization" ECF No. 77, Page ID.545 as the Government claims, but this statement must be put context. All of these tasks were done at the direction of his supervisors and were basically ministerial in nature. As is stated in Mr. Stassi's sentencing memorandum, Mr. Aleksandr Grichishkin stated that Mr. Stassi "as a newer hire was given simple tasks to perform. . ." Similarly Mr. Skorodumov stated, "[Mr. Stassi] was responsible for simple network administration tasks such as registering domain names, forwarding abuse complaints, and basic system administration." **.**

The government writes that Mr. Stassi's motivation was "for profit." But as noted above, Mr. Stassi received very little remuneration. He was hardly engaged in a get rich quick scheme.

Mr. Stassi does not take issue with the harm that was caused by the organization and has taken full responsibility for his role in it. But as the government concedes, Mr. Stassi was a "minimal participant," and at virtually all times he was acting at the direction of his superiors. This, of course, does not excuse his conduct, but his role in the organization must be put into the proper perspective.

In section 5 of its Sentencing Memorandum, *"The Need to Avoid Unwarranted*

*Sentencing Disparities,"* the government cites to a number of cases where defendants involved in "similar" cases have received sentences ranging from 33 months to 18 years. ECF No. 77, Page ID.554. They may be similar in the sense that the conduct involved cybercrime. However, the conduct of the defendants in those cases is certainly *not* similar to Mr. Stassi's conduct.

The government first cites to the 60 month sentence meted out to Marko Leopard *United States v. Bondarenko et al.* No. 2:17-CR-306-29, ECF No. 813 (D. Nev. Mar. 24, 2021). *Ibid.* Mr. Leopard's role in the offense was far more extensive than that of Mr. Stassi's. For example, unlike Mr. Stassi, who simply performed ministerial tasks, Mr. Leopard designed hosting infrastructure and actually hosted illegal websites. See pages 5-14 of Mr. Leopard's plea agreement, which is attached as exhibit A. In addition, Mr. Leopard acknowledged in his plea agreement that the loss attributable to his conduct was a staggering $568,000,000. *Ibid.* Finally, Mr. Leopard had previously been convicted for similar conduct in Moldavia.

The government also cites to the 33 month sentence received by Mr. Sahurovs in *United States v. Sahurovs et al.* No. 0:11-CR-177-1, ECF No. 80 (D. Minn. Sept. 12, 2018). *Ibid.* Again, Mr. Sahurovs's role in the conspiracy was far more extensive than Mr. Stassi's. Mr. Sahurovs was the actual operator of a Latvia based bulletproof web hosting service. See pages 2-4 of Mr. Sahurovs plea agreement, which is attached

as exhibit B. Moreover, Mr. Sahurovs earned between $150,000-$250,000. By contrast, Mr. Stassi earned approximately $35,000 the entire time he worked at the "organization."

The government also cites to the 18 year sentence in *United States v. Vega*, No. 1:07-CR-707-1, ECF No. 105 (E.D.N.Y. Dec. 18, 2013). ECF No. 77, Page ID.555-556. The government correctly notes that Mr. Vega was the "*founder* of cybercrime marketplace Carderplanet, which was used to check validity of and sell stolen credit cards." (Emphasis added). The government fails, however, to note that CarderPlanet "had over 6000 members and had a hierarchical leadership structure that borrowed its leadership titles from the Mafia." See page 5 of the government sentencing memorandum attached as exhibit C. Mr. Vega "admitted that he was a member and co-founder of CarderPlanet and had an instrumental role in the CarderPlanet website." When arrested in Cyprus, Mr. Vega had a computer that "contained more than 500,000 stolen credit card numbers issued for over 7000 different financial institutions throughout the world." Exhibit C at p. 6. Although Mr. Vega entered into a cooperation agreement, he breached his agreement by moving to withdraw his plea and engaged in significant misconduct after pleading guilty. Exhibit C, pp. 6-11. Finally, Mr. Vega had previously been convicted in Cyprus and had already pled guilty to 21 counts of an indictment issued to the Northern District of California when

he was sentenced in the Eastern District of New York.

The Government also cites to 168 month sentence and the 78 months sentence the defendants received in *United States v. Bondars et al.*, No. 1:16-CR-228, ECF No. 168, 248 (E.D. Va., Sept 21, 2018 and Apr, 2019) ECF No. 77, Page ID.555. In describing the conduct for which the defendants were sentenced, the government writes, "defendants hosting 'Scan4You," a site providing infrastructure and tools used in cybercrime." *Ibid.* This description hardly describes the scope of the conduct in that case. The plea agreement in that case references a separately filed Statement of Facts in connection with the plea agreement. The statement of Facts is 13 pages long and is attached as exhibit D. According to the Statement of Facts, the defendant's conduct is no way comparable to that of Mr. Stassi's. The defendants in that case operated and were co-owners and co-administrators of the service. The organization performed several services including operating a counter antivirus service. The statement of Facts It described the antivirus service as "the largest service of its kind." Moreover, "throughout its lifetime, the [organization] had thousands of users had received and scanned millions of malicious files." *Id* p 5.

"In addition to running the [organization] themselves, [the defendants] also entered into something akin to franchise agreements with co-conspirators in other countries." *Id* at, p. 6. By using the defendants service, their co-conspirators were able

"to perpetrate hundred of thousands of computer intrusions in the United States and elsewhere." *Id* at 8. To get the full flavor of the defendant's conduct, undersigned counsel invites this court to review exhibit D in its entirety.

The Government next cites to the 108 months sentence given to "the operator of two online forums devoted to the facilitation of payment card fraud, computer hacking" in *United States v. Burkov*, No. 1:15-CR-245, ECF No. 53 (E.D. Va. June 26, 2020). ECF No. 77, Page ID.555.  Again, this short descriptor does not fully describe the scope of the criminal conduct." As in *Bondars,* the plea agreement references a separately filed statement of facts in connection with the plea agreement. The Statement of Facts is 13 pages long and is attached as exhibit E. Unlike Mr. Stassi, the defendant in *Burkov* "controlled and operated CardPlanet.cc" which "sold stolen payment card data from virtually all major U.S. payment cards under the 'company-1' brand and issued by 'bank-1.'" Company-1 was a major US credit card company and Bank-1 was a major U.S. bank that issued credit cards. "[T]he Cardplanet website. . . enabled customers to instantly validate stolen payment card numbers that the customer purchase. [I]n order to maintain a constant supply of stolen credit and debit card data. . . The defendant solicited stolen payment card data from other cyber criminals." Exhibit E, p. 2. "Through the Cardplanet website, [the defendant] offered for sale stolen payment card data from more than 150,000

compromise payment cards . . . Knowing that the stolen data would be used to create counterfeit cards in order to make fraudulent purchases." *Id* at p.3.

In addition to operating the Cardplanet website, Burkov also ran a cybercrime forum which among other things "allow[ed] elite cyber criminals to meet in a location where they would have access to other elite trusted co-spirit and where they could plan and assist in cybercrimes, the advertisement, purchase, and sale of stolen goods and the legal services. The stolen goods advertised on [the forum] included stolen payment card data, stolen personal identifying information, and malware. The illegal services advertised on the [forum ] included money-laundering service access to networks of compromised computers." Again, counsel invites this court to review the attached statement of facts in its entirety to get the full flavor of the scope of the defendant's operation.

The final defendant the government refers to is Roman Seleznev who received a 168 month sentence in 2 different cases in the Northern District of Georgia, *United States v. Pleshchuk et al. (Seleznev)*, No. 1:09-CR-491-13, ECF No. 316 (N.D. Ga. Dec. 1, 2017)and *United States v. Seleznev*, 1:17-CR-306-1, ECF. No. 9 (N.D. Ga. Dec. 4, 2017), ECF No. 77, Page ID.555-556, said sentences to run concurrently. As with the aforementioned cases, Mr. Seleznev's role in the conspiracy was far more extensive and than that of Mr. Stassi's. According to the factual basis contained in Mr.

7

Seleznev's plea agreement which is attached as exhibit F, he was involved in a conspiracy where hackers accessed debit cards that were issued by various banks, inflated the balances on the debit cards and then distributed the card data to "cashers" who would then fraudulently withdraw money from ATM machines using the stolen cards. Mr. Seleznev "was a lead casher who obtained an account number and PIN code from a co-conspirator." He then distributed the card information to other cashiers who would then make withdrawals. After the co–conspirators made their fraudulent withdrawals, they returned the majority of the proceeds to Mr. Seleznev who then distributed majority of the proceeds to a co-conspirator. In a single day, Mr. Seleznev and his sub-cashers withdrew over $2,000,000.

In addition to being a "casher," Mr. Seleznev was also associated with another organization, Carder.su. The factual basis of Mr. Seleznev's plea agreement described the organization as follows:

> The Carder.su organization was a criminal enterprise that existed to enrich its members and associates to acts of identity theft and financial fraud, including, but not limited to, acts involving trafficking in stolen means of identification; trafficking in, production, and use of counterfeit identification documents; identity theft; trafficking in, production and use of unauthorized and counterfeit access devices; and bank fraud.

Mr. Seleznev was what was referred to as a vendor. The vendors advertised and sold products, services, and other contraband to members of the Carder.su organization through its websites. The factual basis states that Mr. Seleznev:

> . . .sold members such a large volume of product that he created an

automated website, which he advertised on the Carder.su websites. His automated website allowed members to log into and purchase stolen credit card and account data.

The defendants in the aforementioned cases played a major role in the crimes charged and in most of the cases played **the** major role. The cases cited by the government are simply not comparable to Mr. Stassi's role in the case at bar.

For the reasons stated in Mr. Stassi's sentencing memorandum in this reply, sentence of time served with a term of supervised release is "sufficient, but not greater than necessary, to comply with" the factors set forth in 18 U.S.C. § 3553(a)(2).

        Respectfully submitted,

        LaRene & Kriger, P.L.C

        s/ Mark J. Kriger
        MARK J. KRIGER (P30298)
        645 Griswold, Suite 1717
        Detroit, MI 48226
        313-967-0100
        Email: mkriger@sbcglobal.net

Dated: June 16, 2021

CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2021 I electronically filed the foregoing paper with the Clerk of the Court using the ECF system. I further certify that I have emailed a copy of the foregoing to Assistant United States Attorney Patrick Corbett and Louisa Marion, attorney for the Department of Justice and Robert Luke of United States Probation Department.

s/ Mark J. Kriger

MARK J. KRIGER (P30298)
645 Griswold, Suite 1717
Detroit, MI 48226
313-967-0100
Email: mkriger@sbcglobal.net